**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| R2 Solutions LLC, | |
| Plaintiff, | Civil Action No. 6:21-cv-552 |
| v. | Jury Trial Demanded |
| iHeartMedia, Inc., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff R2 Solutions LLC files this Complaint against iHeartMedia, Inc. for infringement of U.S. Patent Nos. 7,698,329 ("the '329 patent"), 8,341,157 ("the '157 patent"), and 8,190,610 ("the '610 patent"). The '329 patent, '157 patent, and '610 patent are referred to collectively as the "patents-in-suit."

## THE PARTIES

1. Plaintiff R2 Solutions LLC ("R2 Solutions") is a Texas limited liability company with a place of business at 6136 Frisco Square Blvd, Suite 400, Frisco, Texas 75034.

2. On information and belief, Defendant iHeartMedia, Inc. ("iHeartMedia") is a Delaware corporation with a regular and established place of business located at 20880 Stone Oak Pkwy, San Antonio, Texas 78258. iHeartMedia may be served with process through its registered agent, C T Corporation System, located at 1999 Bryan St, Suite 900 Dallas, TX 75201.

3. iHeartMedia is a media company specializing in radio broadcasting. In addition to owning hundreds of AM and FM radio stations, iHeartMedia engages in internet radio streaming via its iHeartRadio platform.

4.    The iHeartRadio platform is available as web, desktop, and mobile applications. The iHeartRadio platform was developed by, and is currently owned and/or operated by, iHeartMedia:

> This site or application is owned or managed by iHeartMedia, Inc. ("iHeartMedia") and is part of the iHeartMedia family of companies, which includes other quality entertainment brands such as broadcast and Internet radio stations, iHeartMedia, and the Premiere Networks, each of which operates or manages one or more websites or applications (each a "iHeartMedia Site," and collectively the "iHeartMedia Sites").

https://www.iheart.com/content/terms-of-use/.





https://play.google.com/store/apps/details?id=com.clearchannel.iheartradio.controller&hl=en_U
S&gl=US.

## JURISDICTION AND VENUE

5.      This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et
seq.*  This Court's jurisdiction over this action is proper under the above statutes, including 35
U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338
(jurisdiction over patent actions).

6.      This Court has personal jurisdiction over iHeartMedia in accordance with due
process and/or the Texas Long Arm Statute because, among other things, iHeartMedia does
business in this State by, among other things, "recruit[ing] Texas residents, directly or through an
intermediary located in this state, for employment inside or outside this state."  TEX. CIV. PRAC.
& REM. CODE § 17.042(3):



https://iheartmedia.wd5.myworkdayjobs.com/External_iHM/5/refreshFacet/318c8bb6f55310002
1d223d9780d30be.

7.      Further, this Court has personal jurisdiction over iHeartMedia because it has engaged, and continues to engage, in continuous, systematic, and substantial activities within this State, including the substantial marketing and sale of products and services within this State and this District.   Indeed, this Court has personal jurisdiction over iHeartMedia because it has committed acts giving rise to R2 Solutions' claims for patent infringement within and directed to this District, has derived substantial revenue from its goods and services provided to individuals in this State and this District, and maintains regular and established places of business in this District, including at least iHeartMedia's corporate headquarters in San Antonio.

8.      Relative to patent infringement, iHeartMedia has committed, and continues to commit, acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and/or sold infringing products and services in this State, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District.   Such infringing products and services include (1) the iHeartRadio application, and (2) iHeartMedia's data analytics system built on Apache Hadoop.   All such infringing systems are hereinafter referred to collectively as the "iHeartMedia Systems."   Such iHeartMedia Systems have been, and continue to be, made, offered for sale, distributed to, sold, and/or used in this District, and the infringing conduct has caused, and continues to cause, injury to R2 Solutions, including injury suffered within this District.   These are purposeful acts and transactions in this State and this District such that iHeartMedia reasonably should know and expect that it could be haled into this Court because of such activities.

9.      On information and belief, iHeartMedia customers use the iHeartRadio application in this District in an infringing manner.  For example, iHeartMedia customers in the District submit queries using the iHeartRadio application.  Users exert control over the computer readable medium that is capable of executing the method described in the claims of the '157 patent.  *See* Ex. 5 at Slides 6–11 ("receiving, over a network, a query from a user").  Search results are transmitted for display in the customer's iHeartRadio media application using network infrastructure in this District.  iHeartMedia customers in this District obtain beneficial enjoyment of the iHeartRadio application.  *See* Ex. 5 at Slides 36–37 ("transmitting the result, over the network, to the user").

10.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because iHeartMedia has regular and established places of business in this District and has committed acts of infringement in this District.  iHeartMedia's regular and established places of business in this District include, at least, its San Antonio, Texas corporate headquarters.  Paragraphs 2 and 4 are herein incorporated by reference.  Indeed, iHeartMedia conducts business in this District, including marketing and selling the iHeartMedia Systems to customers located in this District. iHeartMedia's activities, or the actions of the iHeartMedia Systems, in the District satisfy one or more elements claimed in the patents-in-suit.

## **BACKGROUND**

11.      The patents-in-suit were filed by Yahoo! Inc. ("Yahoo!") between 2006 and 2009. At the time, Yahoo! was a leading Internet communications, commerce, and media company. Yahoo! invested billions of dollars in research and development over this period, filing hundreds of patent applications each year to cover the innovative computing technologies emerging from its expansive research and development efforts.

12.      Yahoo! began as a directory of websites that two Stanford graduate students developed as a hobby.  The name "Yahoo" stands for "Yet Another Hierarchical Officious Oracle," a nod to how the original Yahoo! database was arranged hierarchically in layers of subcategories. From this initial database, Yahoo! would develop and promulgate numerous advancements in the field of data storage and recall.

13.      For example, in 1995, Yahoo! introduced Yahoo! Search.  This software allowed users to search the Yahoo! directory, making it the first popular online directory search engine. This positioned Yahoo! as the launching point for most users of the World Wide Web.  By 1998, Yahoo! had the largest audience of any website or online service.

14.      However, the early iterations of Yahoo! Search did not operate like a modern search engine because Yahoo! Search was only a directory.  Yahoo! Search first integrated a Web crawling engine in 2000.  Yahoo! Search used Google's Web crawling engine from 2000–2004. During this time, Yahoo! was developing its own Web search technologies.  Yahoo! deployed its own Web crawler in early 2004.  The engine, known as Slurp, allowed Yahoo! to collect documents from the Web and build a searchable index.  The patents-in-suit relate to innovations associated with Yahoo! Search that were developed and implemented during this period, which enabled Yahoo! to become Google's biggest competitor in the search engine space.

**THE PATENTS-IN-SUIT**

15.      The '329 patent is entitled, "Method for Improving Quality of Search Results by Avoiding Indexing Sections of Pages."  The '329 patent lawfully issued on April 13, 2010 and stems from U.S. Patent Application No. 11/652,356, which was filed on January 10, 2007.  A copy of the '329 patent is attached hereto as Ex. 1.

16. The '157 patent is entitled, "System and Method for Intent-Driven Search Result Presentation." The '157 patent lawfully issued on December 25, 2012 and stems from U.S. Patent Application No. 12/533,299, which was filed on July 31, 2009. A copy of the '157 patent is attached hereto as Ex. 2.

17. The '610 patent is entitled, "MapReduce for Distributed Database Processing." The '610 patent lawfully issued on May 29, 2012 and stems from U.S. Patent Application No. 11/539,090, which was filed on October 5, 2006. A copy of the '610 patent is attached hereto as Ex. 3.

18. R2 Solutions is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

19. The specifications of the patents-in-suit disclose shortcomings in the prior art and then explain, in detail, the technical way the claimed inventions resolve or overcome those shortcomings. And, accordingly, the claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101. They are not directed to abstract ideas, and the technologies covered by the claims consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

20. The '329 patent explains that nefarious parties can trick traditional search engines "into recalling documents and inflating their ranking" using techniques known as "search engine spamming." '329 patent at 2:6–8. For example, spamming may be used to "trick search engine ranking algorithms into recalling and highly ranking documents that contain . . . sponsored links to a web merchant." *Id.* at 2:8–11. The result is that search results for many queries include irrelevant content that the querier did not desire. *Id.* at 2:14–17. The specification offers an illustration involving a user shopping for a camera:

A typical example of search engine spam is when a user tries to search for the terms "digital camera reviews" and expects to find pages which review various models of digital cameras, detailing performance specifications, sample images and reviewer pros and cons list. Having this expectation when the user clicks on a link for one of the results, the user is instead led to a page that contains nothing but a plethora of keywords and links to other stores where he can buy the camera.

*Id.* at 2:18–27. Thus, "there is need for mechanisms that prevent hiding of search engine spam but yet allow webmasters to designate page content that should not be indexed." *Id.* at 2:34–37.

21.    The specification describes a novel approach to achieve this goal.

As a crawler examines an individual document, one of the attributes that can be considered is section structure. In examining the various sections, the crawler identifies sections to ignore, that is, to not index in search engine indexes and or otherwise use for recalling the document. Such sections are referred to herein as "no-recall sections." Those portions that are indexed for recalling are referred to as recall sections. In an embodiment, a crawler ignores no-recall sections demarcated by, for example, a tag. In another embodiment a no-recall section may be identified by analyzing section content rather than examining only delimiters. The terms inside no-recall sections do not contribute to the document term frequency counts and are not used for recalling the documents in response to search engine queries. However the no-recall sections are included as input to forms of analysis of the document that affect, for example, the document's ranking. Links inside the no-recall sections as well as the rest of the document may be followed in order to discover new content. The document may be analyzed for the amount of advertisements or other features in its entirety. Therefore, terms inside the no-recall sections can affect document ranking.

*Id.* at 3:7–27. This prevents nefarious parties from hiding search engine spam because pages with "copious amounts of advertisements, or low quality links, will be readily identified and ranked accordingly." *Id.* at 3:28–31.

22.     Claim 1 of the '329 patent embodies this solution:

A method, comprising:

ranking a plurality of documents recalled by a search engine for a query;

wherein the plurality of documents contain certain documents, **each document of said certain documents containing at least one section that is not used by said search engine for recall** and one or more sections that are used by said search engine for recall;

**wherein ranking** a plurality of documents includes ranking said plurality of documents **based, at least in part, on the at least one section of said certain documents not used by said search engine to recall documents**; and;

wherein the method is performed by one or more computing devices.

(emphases added).

23.     The claimed method of indexing pages improves navigation of the World Wide Web by increasing the relevance of search results and thwarting nefarious Web users seeking to game Web query rankings.  *See, e.g.*, *id.* at 1:67–2:17.  By improving the functionality of the Web, the claimed invention is necessarily rooted in the improvement of computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity.  For example, by not ignoring no-recall sections when ranking the documents, the claimed invention prevents a document from being "designed so that content that increases recall and/or ranking potential is placed in the recall section and content that diminishes high ranking potential is hidden in a no-recall section."  *Id.* at 4:1–9.  This allows "[a]ll the attributes in all of the sections of a document such as 'links,' frequency of terms, coloring, font, etc." to be considered in the spam and relevancy analyses.  *Id.* at 4:13–16.  The result is that a search engine can "affect the recall and ranking of documents to more accurately reflect relevance of the documents to search engine queries."  *Id.* at 3:1–3.

24.     Relative to the '157 patent, the specification explains that if, as in the case of traditional search engines, the "engine simply regards a web query as, for example, a 'bag of words', the search engine will search for web pages and other data objects (e.g., images, audio files, text files) that contain, or are otherwise associated with, the individual words within the query." '157 patent at 4:1–5.  However, simply treating a user query as a "bag of words" may yield results that do not align with the purpose of the user's search.  Thus, the specification teaches:

> When a user submits a query to a web search service such as the Yahoo! or Google search services, the user generally has some intent. The user's intent may simply be to explore information available on the web relating to one or more topics, for example, a user may simply wish to browse web sites relating to "rainforests" without having any specific purpose in mind. Commonly, however, a user has a more focused purpose in mind. By entering a "rainforest" query, a user may wish to obtain information on traveling to a rainforest, or on purchasing CDs or books having rainforests as a subject or purchasing rainforest themed merchandise such as clothing or accessories.

*Id.* at 3:46–57.

25.     While other search engines existing at the time could tailor search results by ranking the results and displaying each result with a title and brief abstract taken from the document, the '157 patent explains how "results could be significantly enhanced if the likely intent of the query is known."  *Id.* at 4:16–17.  Rather than return all documents having matching keywords—i.e., by using traditional indexing methods—a narrower set of results can be returned if the search results are "ranked such that results that are more relevant to the user's intent appear at or near the top of the search results."  *Id.* at 4:17–19.  Interpretation of the result set is further improved because the results display may be customized based on the user's search intent.  *See id.* at 19–26.

26.     Indeed, the claims of the '157 patent provide just such a solution to the problem of identifying relevant search results using traditional document indexing methods.  For example, Claim 1 of the '157 patent discloses a method comprising:

> receiving, over a network, a query from a user, the query comprising at least one query token;
>
> analyzing the query, using at least one computing device, to identify at least one query keyword;
>
> determining, at least the one computing device, *a plurality of intents from the at least one keyword*, each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query;
>
> classifying the query, using the at least one computing device, *into at least one of the plurality of intents*;
>
> identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;
>
> assigning, using the at least one computing device, *at least one of the plurality of intents* to at least some of the plurality of data objects;
>
> ranking, using the at least one computing device, the plurality of data objects;
>
> building a result, using the at least one computing device, using the ranked plurality of data objects, the result comprises a plurality of display entries, *at least one display entry customized to a respective assigned intent is constructed for each of the ranked plurality of data objects*; and
>
> transmitting the result, over the network, to the user.

(emphases added).

27.     The inventions described and claimed in the '157 patent improve the speed, efficiency, effectiveness, and functionality of computer systems.  Moreover, the inventions provide an improvement in computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity.  For example, by ranking documents based on intent,

rather than using "a traditional {query,document} score," the probability is greater that a relevant result will be in the final result set presented to the user. *See id.* at 12:7–22. This reduces the number of queries that must be processed in order to return relevant results to the user. As a result, the processor is free to allocate more resources to other tasks.

28.     Finally, the '610 patent explains, for example, that "conventional MapReduce implementations do not have facility to efficiently process data from heterogeneous sources" and that "it is impractical to perform joins over two relational tables that have different schemas." '610 patent at 3:9–20. To solve these problems, the '610 patent discloses an invention where user-configurable MapReduce functions are applied to data from heterogeneous data sources (having different schema), followed by application of a reduce function on intermediate data based on a common key. As the specification explains:

> [T]he MapReduce concept may be utilized to carry out map processing independently on two or more related datasets (e.g., related by being characterized by a common key) even when the related data sets are heterogeneous with respect to each other, such as data tables organized according to different schema. The intermediate results of the map processing (key/value pairs) for a particular key can be processed together in a single reduce function by applying a different iterator to intermediate values for each group. In this way, operations on the two or more related datasets may be carried out more efficiently or in a way not even possible with the conventional MapReduce architecture.

*Id.* at 8:47–58.

29.     Such a solution is embodied, for example, in Claim 1 of the '610 patent:

A method of processing data of a data set over a distributed system, wherein the data set comprises a plurality of data groups, the method comprising:

partitioning the data of each one of the data groups into a plurality of data partitions that each have a plurality of key-value pairs and providing each data partition to a selected one of a plurality of mapping functions that are each ***user-configurable*** to

independently output a plurality of lists of values for each of a set of keys found in such map function's corresponding data partition to form corresponding intermediate data for that data group and identifiable to that data group, ***wherein the data of a first data group has a different schema than the data of a second data group*** and the data of the first data group is mapped differently than the data of the second data group so that different lists of values are output for the corresponding different intermediate data, ***wherein the different schema and corresponding different intermediate data have a key in common***; and

reducing the intermediate data for the data groups to at least one output data group, including processing the intermediate data for each data group in a manner that is defined to correspond to that data group, so as to result in a ***merging of the corresponding different intermediate data based on the key in common***,

wherein the mapping and reducing operations are performed by a distributed system.

(emphases added).

30.     The inventions described and claimed in the '610 patent improve the speed, efficiency, effectiveness, and functionality of computer systems.  Moreover, the inventions provide an improvement in computer functionality rather than economic or other tasks for which a computer is used in its ordinary capacity.  For example, the '610 patent states that the disclosed inventions "enhance[] the utility of the MapReduce programming methodology."  *Id.* at Abstract, 1:31–33, 1:66–2:2.

31.     The '610 patent specification goes on to explain that "[t]he intermediate results of the map processing (key/value pairs) for a particular key can be processed together in a single reduce function by applying a different iterator to intermediate values for each group."  *Id.* at Abstract, 1:37–39, 2:4–8.  And the specification discusses the use of multiple processors to perform processing functions in parallel.  *See id.*  As a result, computer functionality is improved. *Id.* at 1:42–44.

13

32.     Additionally, the claimed inventions provide for more dynamic, customizable, and efficient processing of large sets of data. *See, e.g.*, *id.* at 2:58–61, 4:18–22. The inventions provide optimization, which increases efficiency and reduces processor execution time. *See id.* at 2:64–67 (explaining that the claimed invention "can make the processing of the output data more efficient and/or convenient"). As the specification describes, the combiner function in the claimed invention "helps reduce the network traffic and speed up the total execution time." *Id.* at 3:1–8.

33.     The specification also discusses the use of configurable settings to reduce processing overhead. *See, e.g.*, *id.* at 4:60–62, 5:33–39.

34.     In essence, each of the patents-in-suit relate to novel and non-obvious inventions in the fields of search engines, database structures, and graphical user interfaces.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,698,329

35.     R2 Solutions incorporates paragraphs 1–15, 18–23, and 34 herein by reference.

36.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

37.     R2 Solutions is the owner of the '329 patent with all substantial rights to the '329 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

38.     The '329 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

39.     iHeartMedia has directly infringed and continues to directly infringe one or more claims of the '329 patent in this District and elsewhere in Texas and the United States.

40.     To this end, iHeartMedia has infringed and continues to infringe, either by itself or via an agent, at least claims 1 and 4–5 of the '329 patent by, among other things, making, offering to sell, selling, testing and/or using the iHeartRadio application.

41.     Attached hereto as Ex. 4, and incorporated herein by reference, is a representative claim chart detailing how iHeartMedia infringes the '329 patent.

42.     iHeartMedia is liable for its infringements of the '329 patent pursuant to 35 U.S.C. § 271.

***Damages***

43.     R2 Solutions has been damaged as a result of iHeartMedia's infringing conduct described in this Count.  iHeartMedia is, thus, liable to R2 Solutions in an amount that adequately compensates it for iHeartMedia's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 8,341,157**

44.     R2 Solutions incorporates paragraphs 1–14, 16, 18–19, 24–27, and 34 herein by reference.

45.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

46.     R2 Solutions is the owner of the '157 patent with all substantial rights to the '157 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

47.     The '157 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

**Direct Infringement (35 U.S.C. § 271(a))**

48.     iHeartMedia has directly infringed and continues to directly infringe one or more claims of the '157 patent in this District and elsewhere in Texas and the United States.

49.     To this end, iHeartMedia has infringed and continues to infringe, either by itself or via an agent, at least claims 1–5 and 11 of the '157 patent by, among other things, making, offering to sell, selling, testing and/or using the iHeartRadio application.

50.     Attached hereto as Ex. 5, and incorporated herein by reference, is a representative claim chart detailing how iHeartMedia infringes the '157 patent.

51.     iHeartMedia is liable for its infringements of the '157 patent pursuant to 35 U.S.C. § 271.

**Indirect Infringement (35 U.S.C. § 271(b))**

52.     iHeartMedia has knowledge of the '157 patent at least based on the filing and service of this Complaint.

53.     Despite having knowledge of the '157 patent, iHeartMedia has specifically intended, and continues to specifically intend, for persons (including customers and end users) who subscribe to/acquire and/or use the iHeartRadio platform to use the iHeartRadio platform (which is stored on one or more computer readable media) such that those persons (including customers and end users) infringe claim 2 of the '157 patent.  This is evident when iHeartMedia encourages and instructs persons (including customers and end users) in the use and operation of the iHeartRadio platform, including the use of the search feature.

54.     In particular, despite having knowledge of the '157 patent, iHeartMedia has provided, and continues to provide, instructional materials that specifically teach and encourage persons (including customers and end users) to use the iHeartRadio platform in an infringing

16

manner.  *See,   e.g.*,   https://iheartblog.iheart.online/post/introducing-iheartradio-allaccess?_ ga=2.245378883.630490377.1622064048-1394191712.1620248977;   https://help.iheart.com/hc /en-us/articles/228920387-Searching-for-a-station-on-Amazon-Fire-TV.   By providing such instructions, iHeartMedia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement.  iHeartMedia is, thus, liable for induced infringement under 35 U.S.C. § 271(b).

***Damages***

55.   R2 Solutions has been damaged as a result of iHeartMedia's infringing conduct described in this Count. iHeartMedia is, thus, liable to R2 Solutions in an amount that adequately compensates it for iHeartMedia's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 8,190,610

56.   R2 Solutions incorporates paragraphs 1–14, 17–19, and 28–34 herein by reference.

57.   This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

58.   R2 Solutions is the owner of the '610 patent with all substantial rights to the '610 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

59.   The '610 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

***Direct Infringement (35 U.S.C. § 271(a))***

60.   iHeartMedia has directly infringed and continues to directly infringe one or more claims of the '610 patent in this District and elsewhere in Texas and the United States.

61.     To this end, iHeartMedia has infringed and continues to infringe, either by itself or via an agent, at least claims 1–5, 17–21, 33–34, and 40–41 of the '610 patent by, among other things, making, offering to sell, selling, testing and/or using the iHeartMedia data analytics system built on Apache Hadoop.

62.     Attached hereto as Ex. 6, and incorporated herein by reference, is a representative claim chart detailing how iHeartMedia infringes the '610 patent.

63.     iHeartMedia is liable for its infringements of the '610 patent pursuant to 35 U.S.C. § 271.

*Damages*

64.     R2 Solutions has been damaged as a result of iHeartMedia's infringing conduct described in this Count.  iHeartMedia is, thus, liable to R2 Solutions in an amount that adequately compensates it for iHeartMedia's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## DEMAND FOR A JURY TRIAL

R2 Solutions demands a trial by jury on all issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

R2 Solutions respectfully requests that this Court enter judgment in its favor and grant the following relief:

(i)     Judgment and Order that iHeartMedia has directly infringed one or more claims of each of the patents-in-suit;

(ii)    Judgment and Order that iHeartMedia has indirectly infringed one or more claims of the '157 patent;

(iii)     Judgment and Order that iHeartMedia must pay R2 Solutions past and future damages under 35 U.S.C. § 284, including supplemental damages arising from any continuing, post-verdict infringement for the time between trial and entry of the final judgment, together with an accounting, as needed, as provided under 35 U.S.C. § 284;

(iv)     Judgment and Order that iHeartMedia must pay R2 Solutions reasonable ongoing royalties on a go-forward basis after Final Judgment;

(v)     Judgment and Order that iHeartMedia must pay R2 Solutions pre-judgment and post-judgment interest on the damages award;

(vi)     Judgment and Order that iHeartMedia must pay R2 Solutions' costs;

(vii)     Judgment and Order that the Court find this case exceptional under the provisions of 35 U.S.C. § 285 and accordingly order iHeartMedia to pay R2 Solutions' attorneys' fees; and

(viii)     Such other and further relief as the Court may deem just and proper.

Dated: June 1, 2021

Respectfully submitted,

*/s/ Edward R. Nelson III*
**EDWARD R. NELSON III**
STATE BAR NO. 00797142
**BRENT N. BUMGARDNER**
STATE BAR NO. 00795272
**CHRISTOPHER G. GRANAGHAN**
STATE BAR NO. 24078585
**HILL BRAKEFIELD**
STATE BAR NO. 24110604
**NELSON BUMGARDNER ALBRITTON PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111
ed@nbafirm.com
brent@nbafirm.com
chris@nbafirm.com
hill@nbafirm.com

**COUNSEL FOR**
**PLAINTIFF R2 SOLUTIONS LLC**